UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

Marcus Abrams,

                                        Plaintiff,

v.

UY Trading Ltd. (#10020400), UY Trading Ltd.          Case No. 20-cv-5174 (LLS)
(#10086420), SEP Consulting Ltd., Sandra
Piedrabuena, Russell Abrams, Titan Capital Group
LLC, Titan Capital Group III, LP, and Titan Capital
Group III, LP Employee Incentive Plan,

                                        Defendants.
_____

### DECLARATION OF RUSSELL ABRAMS IN OPPOSITION
### TO PLAINTIFF'S MOTION FOR ATTACHMENT

        **RUSSELL ABRAMS** hereby declares the following under penalty of perjury pursuant to

28 U.S.C. § 1746:

**Introduction**

        1.        I am a defendant in the above action.  I am married to the defendant Sandra

Abrams.  I am also either an owner/principal/member and/or director of the other named

defendants.  Finally, I am the brother of Plaintiff Marc Abrams.

        2.        I submit this declaration in opposition to Plaintiff's motion for an attachment.

For the reasons discussed below, that motion should be denied in its entirety.

        3.        I want to state at the outset that Sandra and I no longer reside in South America.

We are now residents of the State of Florida.  We have been in Florida since July of 2022, we

just moved into a residence that we lease (a copy of which is attached as Exhibit A), and our children are being registered to attend school in Florida.

4.      The Plaintiff's allegations that we have somehow fled to South America in order to hide from creditors is false.  To the contrary, we have legitimate business interests in South America of which the Plaintiff has always been aware and of which the Plaintiff has been an investor as well.  We are not running from anyone and we can readily be found in the United States.

5.      Next, I want to make it clear that the real property which the Plaintiff seeks to attach (the "Property") is not owned by any of the named Defendants in this action.  Rather, it is owned by a third-party entity in which my wife and I have an interest.  That entity is a legitimate enterprise.  Although the Plaintiff alleges that it is being used as a shell company, he cannot provide any proof that my wife or I have misappropriated its assets or used the entity as a vehicle to avoid personal liability in this action other than speculation.

6.      As discussed more fully below, Plaintiff was not a "Participant" in any deferred compensation plan.  Instead, he received "Profit Participation", i.e., profit sharing, pursuant to his Employment Agreement.  The profit participation program utilized extant Titan investment accounts and, as such, were and still are subject to market risks.

7.      Plaintiff knew full well that the value of his account fell substantially in value in 2010.  So did mine.  We both knew it as it was happening.

8.      Although he knew of the market losses long before 2012, there is documentary proof that Plaintiff signed all of the account opening documents when the profit-sharing funds were transferred to Wells Fargo in September of 2012.  As such, he had full access to all of the

account statements, including the exact balance of his funds at that time.  Yet, he waited approximately 8 years after knowing that there was a loss (a loss which I proportionately sustained in my profit-sharing account as well) to commence this action.

9.      In any event, by Plaintiff's own admission, the entire balance of all money to which he was purportedly entitled under the profit-sharing plan was due no later than January 1, 2017.  Thus, even accepting Plaintiff's false allegations as true, he had full and actual knowledge of any conceivable ERISA breach of fiduciary duty claim no later than January 2, 2017.  Yet, he did not file this suit until more than 3 years later in July of 2020.

10.      Moreover, just as he waited too long to bring this lawsuit, the Plaintiff waited too long to bring a motion for an attachment.  Not only did the wait almost 10 years after the Wells Fargo account was opened – the latest possible date he surely knew that his account had declined in value – to commence this action, he waited yet another 2 years after filing this action to make an application for a provisional remedy.

11.      The Plaintiff received millions of dollars from his profit-sharing account over the years.  Between 2014 and the present, Plaintiff claims that he received at least an additional $900,000.00.  However, the number is substantially in excess of that amount.  Not only has the Plaintiff essentially depleted his own account, but the Defendants have monetary claims against the Plaintiff which exceed that amount.

12.      As I explain below, as a result of the Plaintiff's alleged sexual indiscretions with and harassment of former employees of Titan, the Plaintiff owes Titan approximately $1 million.  Titan was sued in a sexual harassment action in which the Plaintiff, Titan, and others were named as defendants.  The allegations against the Plaintiff, some of which were

evidenced by the Plaintiff's own emails, were so scandalous that they made headlines in the New York Post and other newspapers.

13.     The lawsuit settled in late 2018.  The Plaintiff is responsible for the uninsured portion of that settlement, together with unreimbursed attorneys' fees, because it was his conduct that caused them to be incurred.  That sum is approximately $990,000.00.  To date, the Plaintiff has paid $0 dollars toward that settlement.  Instead, the Defendants herein, who the Plaintiff ironically accuses of evading creditors, paid the entire settlement in full.

14.     On the instant motion, the Plaintiff falsely alleges that Sandra and I made various improper transfers of assets in an effort to evade creditors, including him.  As I explain below, however, that is not the case.  Indeed, almost all of the Plaintiffs allegations are either unsubstantiated and/or demonstrably false and/or pure speculation.

15.     In sum, the Plaintiff was never a participant in any deferred compensation plan. The profit-sharing plan in which he did participate sustained losses in 2010 of which the Plaintiff was fully aware.  He waited over a decade thereafter before commencing this lawsuit, even though he had access to all of the relevant account statements for that entire time.  He owes almost $1 million to the Defendants as indemnification for damages in a sexual harassment lawsuit that would never have been filed but for his own improper conduct.  It should also be noted that the Plaintiff refused to settle at a time when he had the opportunity to do so for $15,000. He waited another 2 years before seeking a provisional remedy based upon false and misleading allegations, and he now claims to have sustained damages in the amount of $25 million, which has been pulled out of thin air.

**The Employment Agreement & Deferred Compensation Plans**

16.     By agreement dated February 15, 2001, Plaintiff became an employee of defendant Titan Capital Group, LLC ("Employment Agreement").  [See Declaration of Plaintiff dated July 13, 2022 ("Plaintiff Dec."), Exh. 1.]

17.     The Employment Agreement provides that Plaintiff was entitled to certain "Profit Participation" based on a formula tracking the company's financial performance.  Id.

18.     Plaintiff attaches to his motion an unsigned Employee Incentive Plan of Titan Capital Group II, LLC dated December 31, 2004 (the "First Plan").  [Id., Exh. 2.]  Relevant provisions of the First Plan are as follows:

- Paragraph 1.1 provides that its purpose is "to provide an incentive to retain eligible employees of the Company".

- Paragraph 1.1 also provides that "[t]he Plan is intended to be a Nonqualified Deferred Compensation Plan within the meaning of section 409A of the Internal Revenue Code of 1986 as amended".

- Paragraph 1.3 provides for the appointment of an Administrator, which was me.

- Paragraph 2.1 provides that employees can only become "Participants" in the First Plan if the Administrator designates them.

- Paragraph 4.1 provides that Participants can defer part or all of their compensation.

- Paragraph 7.1 provides that Participants can choose a distribution upon a specified time, as well as upon disability, when there is a change in ownership/effective control of the company, or due to the occurrence of an unforeseen emergency.  Thus, employees are allowed to receive distributions while they are still employed.

19.     Plaintiff also attaches to his motion an Employee Incentive Plan of Titan Capital Group III, LLP dated December 29, 2008 (the "Second Plan").[1]  [Id., Exh. 3.]  The Second Plan contains the identical provisions as the First Plan set forth above.  The Second Plan is signed by me in my capacity as its Administrator.

20.     As Administrator of the Plans, I know that Plaintiff was not a "Participant" in them because I did not designate him a Participant.  Simply put, the Plaintiff cannot prove that he was a participant under these Plans because he never was.

21.     The funds Plaintiff seeks in this case are actually for-profit participation under the Employment Agreement, not for deferred compensation under the Plans.

**The Actual Value Of Plaintiff's Account**

22.     The Plaintiff makes it appear as if he did not discover that his profit-sharing account had declined in value until "in or about July of 2014."  That is utterly preposterous.  The plaintiff knew of the loss when it happened in 2010.  We both suffered substantial loss and we both discussed it when it happened.

23.     The Plaintiff expects the Court to believe that he simply put all of his trust in me with respect to all of his profit-sharing money because, for more than a decade, I was like a father figure to him.  Nothing could be further from the truth.  My brother was always intimately involved in all financial transactions which directly or indirectly affected him.  I can state with certainty that we had numerous conversations about his profit-sharing monies, including the facts that: (a) he knew they were invested in volatile holdings; (b) he knew whether they increased or declined on a daily basis; (c) he knew that I shared in the same gains

---

[1] The First Plan and the Second Plan are collectively referred to as the "Plans".

and losses as he did; and (d) he was an co-account holder with me and had full access to all investment information and account statements.

24.     In fact, the Plaintiff is an extremely sophisticated investor, as well as an attorney at law admitted to practice in New York.  He is the founder and managing partner of QuantLaw Capital Management, an investment consulting firm in the litigation financing sector.

25.     The Quantlaw website contains the following statement about the Plaintiff:

Marc has over 25 years of experience as an innovator. He's co-founded two successful quantitative driven investment companies and executed over $1.5 billion in institutional transactions. Most recently, in 2017 working with a prior personal investment, Marc devised the auto fleet manager's evolution into the first nonbank, digital, asset backed, and inflation indexed, lending platform in Argentina. He also devised the company's "rent-to-own" program which assists women becoming entrepreneurs; along with a new credit card linked to automobile loans to access the significant unbanked population. Marc's advised and creatively structured investments across the alternative and traditional asset spectrum, including devising a bi-furcated risk structure for a medical cannabis start-up that subsequently won one of four state licenses in January 2014. In 2000 Marc co-founded the first pure play, option arbitrage fund and developed three successful follow-on fund products. He left the firm in 2009 to focus on his personal investments. From 2002 to 2007 Marc also served on the California State Controller's Advisory Council for Alternative Investments.  Marc is currently a Member of the New York State Bar Association and earned his Juris Doctorate from New York University School of Law after achieving the rank of #2 in his first-year law school class. He earned a BA from Boston University in Political Science and Economics where he first became interested in the field of Economic Analysis of Legal Issues.  He lives with his wife, a former museum curator of contemporary African Art, and Navy veteran, and their three young children in a suburb outside New York City.

(See Exhibit B.)

26.     The Plaintiff pretends as if he never paid attention to his profit-sharing account. However, as evidenced by Exhibit C attached hereto, in December of 2010, the Plaintiff borrowed approximately $1.8 million from his profit-sharing account, I repaid those monies to the fund, and the Plaintiff executed a promissory note to me in which he promised to pay back all principal and interest by December of 2012.  He also gave me a lien on his profit-sharing

funds to secure the loan.  Does the Plaintiff expect us to believe that he did not check the

balance of his profit-sharing account and notice the alleged $5 million loss, which had already

occurred, at that time?

27.     There is also evidence that the Plaintiff had to have known of the alleged $5

million loss in his profit-sharing account no later than 2012.  As even the Plaintiff alleges in his

complaint and admits in this motion, in or about September 2012, a Wells Fargo account was

set up to hold the profit-sharing funds.  Attached as Exhibit D are opening documents for the

Wells Fargo account bearing the Plaintiff's signature.  As these documents demonstrate, the

Plaintiff opened this account with me as a <u>co-applicant</u>.  As a co-applicant, the Plaintiff had full

access to all account information.  He was able to check the balance of his profit-sharing funds

on his own, and without my permission, at any time.  He also had trading authorization on the

account.  I believe that the balance of the Plaintiff's profit-sharing account at Wells Fargo was

approximately $1.5 million at inception, which reflected the alleged multi-million dollar loss of

which the Plaintiff complains.

28.     The Plaintiff alleges and admits that, in June of 2014, the Wells Fargo account

was transferred into the "UY Account" with Interactive Brokers, at which time his UY Account

had a balance of approximately $2.1 million. [See Complaint at ¶53.]  This was due to the fact

that an additional $200,000.00 was placed into the account at some point in 2014.

29.     The Complaint and Plaintiff's motion papers conveniently allege that Plaintiff did

not discover the amount in the UY Account until July of 2014, presumably because this action

was not filed until July 7, 2020.  However, conspicuously absent from any facts alleged or

evidence submitted by the Plaintiff is any proof that he complained or even bothered to inquire when he supposedly suddenly discovered a loss of approximately $5 million at that time.

30.    Between 2013 and the present, the Plaintiff claims that he received an additional amount of approximately $900,000.00 from his profit-sharing account.  [See Complaint at ¶ 81-92, 94.]  However, the amount was actually over $1.5 million.  As demonstrated by Exhibit E, the Plaintiff received the following sums on the following dates: (a) $150,000 on 07-09-2016; (b) $200,000 on 06-30 2017; (c) $250,000 on 07-17-2018; (d) $230.000 on 07-06-2018; (e) $350,000 on 11-13-2018; (f) $200,000 on 09-09-2019; and (g) $125,000 on 02-12-2020.

31.    Tellingly, not once between 2008 and 2020 did the Plaintiff complain about any decrease in his profit-sharing account.  In fact, there was communication from the Plaintiff and his wife quite to the contrary wherein they claim that the remaining balance was $1.3 million as of June of 2018.  The most telling of these communications is the call transcript that Plaintiff himself relies upon, attached hereto as Exhibit F.  At that time, the Plaintiff was seeking a final distribution of the balance of his profit-sharing account.  He sought to confirm that he would be paid the full remaining balance owed to him in the precise amount of  $1.3 million.  There was no mention of additional sums owed because the Plaintiff knew there were none.

32.    If the Plaintiff truly believed that a multi-million-dollar loss which occurred before 2012 was due to a breach of fiduciary duty, or as a result of some other improper conduct, why did he not sue the Defendants, or even so much as complain to me, until 2020?

33.    The Plaintiff is now seeking an attachment in the amount of $25 million.  That number is based largely upon the false presumption that over $5 million of the initial amount deposited into Plaintiff's profit-sharing plan back in 2008 was somehow misappropriated by the

Plaintiff more than 8 years prior to the commencement of this action.  As I stated above, the decline in value was actually due to market factors.  But, even assuming for the sake of argument that it was not, the Plaintiff cannot possibly claim in the face of documentary evidence that he was a co-applicant with trading authority on the Wells Fargo Account in 2012 that he did not learn of the loss until July of 2014.

**The Pecile Lawsuit And Defendants' Claims Against Plaintiff**

34.     In 2010, a lawsuit was filed against the Plaintiff, me and others in New York state court.  The lawsuit, *Pecile v. Titan Capital Group*, index No. 0110490/2010, involved, among other things, allegations of sexual harassment arising out of a sexual relationship between the Plaintiff and a former employee of Titan.

35.     The lawsuit became tabloid fodder, and the allegations against the Plaintiff were quite scandalous.  See Exhibit G.   So much so, that the Plaintiff was forced to drop out of the race for the 149th State House seat in Greenwich, Connecticut for which he was running back in 2010.  See Exhibit H.

36.     The lawsuit was settled in December of 2018.  The lawsuit cost a substantial amount to defend, including the settlement payout and attorneys' fees.  Only a portion of that was covered by insurance.  The settlement agreements with the parties and the insurance carrier are confidential and therefore I cannot disclose them voluntarily in this action. However, the unreimbursed portion of settlement proceeds and attorneys' fees was approximately $990,000.00.  As I mentioned above, the Plaintiff paid no part of the settlement. Instead, the Defendants herein, who the Plaintiff ironically accuses of evading creditors, paid the entire settlement in full.

37.     The $990,000.00 does not include the serious damage that the Plaintiff did to the reputation of Titan and its affiliates.  I cannot begin to estimate how much business was lost as a result of the Plaintiff's indiscretions, but it surely was many millions of dollars.

38.     The Defendants are in the process of commencing suit against the Plaintiff in State Court for indemnification and other relief.

**The Property Is Owned By A Non-Party**

39.     As I stated earlier, none of the Defendants holds title to the Property.  It is undisputed that the Property is held by a non-party entity.  The Plaintiff does not have any direct claim against that entity.  That entity is not responsible for any of the acts or conduct alleged in the Plaintiff's complaint.

40.     The Plaintiff claims that the Real Property is held by a "shell" company that is owned by Sandra and me.  However, as discussed below, aside from innuendo, there is no proof that either Sandra or I, or any of the Defendants in this action, have used or are using that entity improperly or to avoid creditors.

**Plaintiff's False Allegations Of Fraud And Contempt**

**Defendants Did Not Violate The State Court Order**

41.     Plaintiff's claim that Sandra and I violated a State Court Order obtained in aid of an unrelated arbitration (the "State Court Order") by transferring the Property from one entity (West 70th Street Owners) to another (SEPI), and by placing encumbrances in excess of the $9 million limit imposed by the State Court Order, is false.

42.     By way of background, the State Court Order was issued in connection with a separate arbitration proceeding, the facts of which are unrelated to this action.  However, the

Court should be aware that the Plaintiff initially sought an attachment from the arbitrator, who denied it.

43.     It was only after unsuccessfully attempting to obtain an attachment from the arbitrator that the Plaintiff decided to seek an attachment from the State Court.  The State Court, however, did not grant an attachment.  It granted a preliminary injunction in aid of arbitration.

44.     Attached as Exhibit I is a copy of the State Court Order.  Contrary to the Plaintiff's assertion, there is nothing in the State Court Order which prevented a transfer of the Property. The only restriction imposed by the State Court Order was that the approximate sum of $1.4 million in net sales proceeds would be placed into escrow in the event that the Property was sold, and that the Property would not be encumbered beyond $9 million.

45.     The "transfer" in question was to an entity with identical ownership.  I agreed that the transferee would be subject to the State Court Order to the same extent as the transferor.  There was no evasion involved.

46.     Moreover, neither Sandra nor I, nor any entity controlled by us, placed any additional encumbrance on the Property.  The encumbrance of which the Plaintiff complains was placed on the Property by a third party to enforce its remedies under a contract that was entered in 2018, which included the right to place a lien on the Property.

47.     At the time of the State Court Order, there were 2 mortgages of record on the Property.  These mortgages (the "Mortgages of Record") had an unpaid principal balance of $6.8 million.

48.     In addition to the Mortgages of Record, in March 2018, a mortgage in the amount of $2 million was executed to a third-party in connection with an investment.  That mortgage (the "ASM Mortgage"), copy of which is annexed as Exhibit J, was not intended by the parties to be recorded and, in fact, was not recorded, for over 4 years.  The Plaintiff knew of this unrecorded transaction.

49.     In February, the loans secured by the Existing Mortgages were refinanced. Pursuant to that refinancing, an additional mortgage in the sum of $450,000 (see Exhibit K) was executed, bringing the total indebtedness to $7.25 million.

50.     Contrary to the Plaintiff's assertion, as shown by the underlying loan document attached as Exhibit L, the $450,000 is encompassed within the $7,250,000 total consolidated mortgage and is not a separate encumbrance.  Accordingly, the collective mortgage indebtedness to AXOS is $7,250,000 – below the $9 million cap in the State Court Order.

51.     There was no reason for me to believe that the holder of the ASM Mortgage was going to record it.  Incredibly, it was Plaintiff who, in April 2022, directly called the principal of ASM and informed him that Plaintiff was seeking to attach or enjoin the Property.  This apparently panicked ASM into recording the mortgage in April 2022.

52.     Neither I, nor Sandra, nor anyone on our behalf, had any role in ASM's decision to take this unexpected step.  None of us received a single dollar as a result of the recording of the ASM Mortgage.

53.     Moreover, had we known that Plaintiff was going to trigger the filing by contacting the holder of the ASM Mortgage, I would have asked the Court for a higher threshold over the $9 million sum.  This would have been perfectly reasonable, given that the

Property has a fair market value of $18.7 million, and still would have equity of more than $11 million (several times the $1.4 million required to be escrowed) if the threshold had been increased to $9.25 million.

**The GlobeOp Judgment Was Fully Satisfied**

54.     Plaintiff next refers to the Globe Op lawsuit as supposed evidence of fraudulent transfers intended to evade creditors.  Quite the opposite is true.  What the Plaintiff does not disclose is that the GlobeOp lawsuit began as an arbitration, and I was not a party.  It was vigorously contested, but the arbitrator entered an award in favor of the petitioners in the amount of approximately $590,000.  That award was confirmed by the Supreme Court, New York County, and a judgment was entered under a different index number than the one referred to in the Plaintiff's complaint.  A copy of the judgment is attached as Exhibit M.

55.     What the Plaintiff fails to tell the Court is that the GlobeOp lawsuit against me personally was filed under a different index number.   The complaint in this second GlobeOp lawsuit alleged fraudulent transfer claims against me, purportedly in my attempt to avoid the judgment entered as a result of the GlobeOp arbitration.  That second suit was filed on January 27, 2015, and it was disposed of in May of 2015 because the judgment was paid in full in March of 2015.  Attached as Exhibit N is a satisfaction of judgment showing that the GlobeOp judgment was fully satisfied on March 18, 2015.

56.     Contrary to Plaintiffs' contentions, people who attempt to avoid their creditors do not do so by paying their judgments in full.   If anything, the GlobeOp lawsuit demonstrates that there are sufficient assets to satisfy judgments that actually enter against the Defendants because they are paid in full.

**Other Alleged Transfers**

57.     The Plaintiff makes false allegations that monies the Defendants sent to or received in South America were somehow fraudulent transfers used to line Defendants' own personal pockets.  In fact, they were arms' length transactions for fair consideration involving legitimate business dealings.

58.     The transfers to which the Plaintiff refers were made in connection with various business ventures in South America.  These included business ventures in which the Plaintiff had an interest, and which are even mentioned in his own biography as excerpted from his company's own website in paragraph 20 above.

59.     If Plaintiff's allegations were correct, one would assume that there would be some documentary proof that the Defendants actually misappropriated funds for their own personal use.  Yet, the Plaintiff has not proffered any actual evidence.

**The Plaintiff Is Not Entitled To A Reduced Bond**

60.     Plaintiff is requesting a minimum bond requirement of only $500.  This request should be denied for the reasons set forth in the accompanying memorandum of law

**Conclusion**

61.     For the reasons stated above and in the accompanying memorandum of law, the Plaintiff's motion should be denied in its entirety.

Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 2, 2022

Russell Abrams